**TRAVELERS INDEMNITY COMPANY, Plaintiff,**

v.

**GENERAL STAR INDEMNITY COMPANY; Glenn Buckman; Selena Buckman; Blue Diamond Trucking, Inc., Defendants.**

**No. Civ.A. 98-1240-PC.**

United States District Court, S.D. Alabama, Southern Division.

June 13, 2001.

E. Martin Bloom, Charles Mark Bain, Friedman, Leak & Bloom, P.C., Birmingham, AL, for Plaintiff.

Frank O. Hanson, Jr., James P. Rea, Elizabeth A. McMahan, Dominick, Fletcher, Yeilding, Wood & Lloyd, Birmingham, AL, Edward C. Greene, W. Austin Mulherin, III, Frazer, Greene, Upchurch & Baker LLC, Mobile, AL, for Defendants.

## ORDER ON SUMMARY JUDGMENT MOTIONS

PITTMAN, Senior District Judge.

Pending before the court are the Motions For Summary Judgment filed by plaintiff Travelers Indemnity Company ("Travelers") (docs. 19–20, 33, 71, 86–87), and by defendant General Star Indemnity Company ("General Star") (docs. 27–28, 81), with responses thereto (docs. 35, 38).[1]

Oral arguments were held on February 23, 2001. Appearing before this court were E. Martin Bloom, Esq., representing Travelers, Elizabeth A. McMahan, Esq., and James P. Rea, Esq., representing General Star, and W. Austin Mulherin, III, Esq., representing Blue Diamond (As noted, Blue Diamond's claims have been settled). At oral argument, the parties agreed that the facts of this matter are as submitted on the record and any dispute in fact should be decided by this court. Following oral argument, the court afforded the parties until February 28, 2001, to supplement their positions with regard to summary judgment. The parties filed several documents (docs. 103–109).

After careful consideration of all matter presented in the record, including pleadings, filings, affidavits, depositions, and exhibits, and for the reasons set forth, the Summary Judgment Motion filed by Trav-

---

1. Defendant Blue Diamond Trucking Inc. ("Blue Diamond") also filed a Motion For Summary Judgement (docs. 29–32), to which the Buckmans joined and adopted (doc. 41). Travelers and General Star have settled with Blue Diamond, in each paying half, and the only issues to be determined in this court are those between Travelers and General Star.

elers is due to be granted and the Summary Judgment Motion filed by General Star is due to be denied.

This is a declaratory judgment action brought by Travelers pursuant to 28 U.S.C. § 2201, *et. seq.*, with jurisdiction based on § 1367(a), and venue pursuant to § 1391(b) in that the events giving rise to this action occurred in this district. Jurisdiction and venue are not disputed.

Travelers is a provider of insurance coverage to Blue Diamond (doc. 1). Travelers provided a defense, with a reservation of rights, for Blue Diamond in a tort action brought by Glenn and Selena Buckman in the Circuit Court of Choctaw County (CV–98–31) which was removed to this court. *Glenn Buckman and Selena Buckman v. Blue Diamond Trucking, Inc.*, C.A. 98–0333–P–M (S.D.Ala. March 29, 2000) (Judgment of Dismissal entered on the parties' stipulation (doc. 41)).

Here, Travelers seeks an adjudication that it owes no duty to defend or indemnify Blue Diamond for the claims made by the Buckmans as that obligation belongs to General Star. Travelers further seeks reimbursement from General Star for the costs of defense incurred defending Blue Diamond against the claims brought by the Buckmans, as General Star refused to defend and indemnify Blue Diamond after demand was made on General Star by Travelers (doc. 1, p. 6).

Travelers raises two contentions in its Motion For Summary Judgment: 1) The Travelers policy, a general liability insurance policy, does not provide coverage for bodily injury arising from the movement of property by a mechanical device not attached to the insured's auto, under Exclusion 8–movement of property by mechanical device; and 2) the General Star policy, a commercial general liability policy, does provide coverage for the Buckmans' claims against Blue Diamond (doc. 20, pp. 6–11). Travelers argues that the General Star policy is intended to offer broad coverage for all aspects of the insured's business, while the Travelers' policy provides limited coverage through a Truckers Coverage Form which is not intended to cover all aspects of the insured's business (doc. 20, p. 11, ¶3).

Defendant General Star is also an insurer of Blue Diamond providing commercial general liability coverage. General Star seeks summary judgment in its favor dismissing Travelers' declaratory judgment action. General Star argues that the Travelers policy provides coverage for Buckman's accident "because the accident resulted from the "... ownership, maintenance or use of a covered auto[ ]' [and] [b]oth ... Buckman and the pipes that injured him were on the 'covered auto' at the time that Buckman was injured. Neither the pipes nor Buckman were on or being moved by a 'mechanical device' at the time ..." of the accident (doc. 27, p. 11).

### A. Undisputed Facts [2]

The present declaratory judgment action arises out of the lawsuit styled *Glenn Buckman and Selena Buckman v. Blue Diamond Trucking, Inc.*, which was originally filed in the Circuit Court of Choctaw County, Alabama, and which was subsequently removed to this court. The Buck-

---

**2.** The Undisputed Facts are complied from the Statements of Undisputed Facts offered by the movants herein together with those set out by the parties in the Joint Pretrial Report (doc. 42–All Admitted or Uncontested Facts, p. 1–6). Unless otherwise cited the Undisputed Facts are from the Joint Pretrial Document.

mans' Complaint as amended alleges, in pertinent part, that

> employees of Blue Diamond ... negligently and improperly caused or allowed loading, stacking or safety devices or equipment, including but not limited to, "pins" to be improperly placed, or failed to property place such devices, causing or allowing steel pipes loaded on the Defendant's truck to roll or fall while Plaintiff Glenn Buckman was standing on or about the pipes. Furthermore, ... Defendant ... failed to provide proper equipment or procedures to secure the pipe causing or allowing it to roll or fall ... Defendant ... failed to supply or use the proper length, type or configuration of trailer to carry said pipe.... Defendant.. knew upon arrival at the job site that the trailer was not the appropriate trailer, size or configuration....

*Id., citing* C.A. 98–0333–P–M (doc. 17–Buckmans' Complaint as Amended). Jurisdiction was based on 28 U.S.C. § 1332.

On April 28, 1997 (doc. 30, p. 4), Travelers issued insurance policy, No. 7LHT238T743–2–97, to Blue Diamond, effective March 1, 1997, to March 1, 1998 (hereinafter referred to as "the Travelers policy") (doc. 20–Ex. A). The Truckers Coverage Form, No. CA 00 12 12 93, under the Travelers policy, provides coverage, as follows:

SECTION II—LIABILITY COVERAGE

A. COVERAGE

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" ... to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

*Id.,* at p. 22. The subject policy also contains the following:

B. EXCLUSIONS

This insurance does not apply to any of the following: ...

8. MOVEMENT OF PROPERTY BY MECHANICAL DEVICE

> "Bodily injury" ... resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

(doc. 20–Ex. A, p. 24). "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include "mobile equipment." *Id.,* at SECTION VI—DEFINITIONS, p. 31, item B.[3]

The Travelers policy reflects three types of "covered autos": Designation Symbol 51, 47 and 50.

> Symbol 51 = ALL OWNED, HIRED, OR NONOWNED AUTOS OPERATED IN CONNECTION WITH YOUR BUSINESS, EXCLUDING PRIVATE PASSENGER TYPE AUTOS

(doc. 20–Ex. A, p. 10, item C, DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS).

> Symbol 47=HIRED "AUTOS" ONLY. Only those "autos" you lease, hire,

---

**3.** "Mobile equipment" means "land vehicles, including ... Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads[ ] ... Vehicles maintained for use solely on or next to premises you own or rent[ ] ... Vehicles that travel on crawler tread[ ] ... Vehicles, whether self-propelled or not, maintains primarily to provide mobility to permanently mounted ... [p]ower cranes, shovels, loaders, diggers or drills; or [r]oad construction or resurfacing equipment such as graders, scrapers or rollers ..." *Id.,* at p. 26, item H.

rent or borrow. This does not include any "private passenger type auto" you lease, hire, rent or borrow from any member of your household, any of your employees, partners or agents or members of their households.

Symbol 50=NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes private passenger type "autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

*Id.*, at p. 21.[4]

General Star is the provider of commercial general liability insurance coverage to Blue Diamond under policy, No. IMA800505, effective March 1, 1997 to March 1, 1998 (hereinafter referred to as the General Star policy") (doc. 27–Ex. J). The Commercial General Liability Coverage Form, No. CG 00 01 10 93, under the General Star policy, provides as follows:

SECTION 1—COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ... to which this insurance applies. We will have the right and

---

4. With the Brief In Support of Motion For Summary Judgment, Travelers submitted a copy of the Travelers' policy issued to Blue Diamond (dc 20–Ex. A, as referred to above). General Star filed a Motion To Strike the Exhibit as it contains a number of "inconsistencies" and is not properly submitted (doc. 25). Travelers opposes the Motion To Strike asserting that the same exhibit was attached to a Request for Admissions and that Blue Diamond admitted that the relevant language appears in its policy. Travelers also accurately asserts that the same exhibit was filed with the petition for declaratory judgment and has been made available to all parties (*compare* docs. 1–Ex. A and 20–Ex. A); and the exhibit is certified as a true copy (doc. 34).

This court notes that several copies of the subject policy have been filed as exhibits in this action (*see* doc. 1–Ex. A; doc. 20–Ex. A; 27–Ex. I; and doc. 30–Ex. B). This court has reviewed the various submissions and found that the relevant and pertinent information is set out in Travelers' Exhibit A (doc. 20). What is missing from the submitted copies (docs. 1–Ex. A and 20–Ex. A) is, *inter alia*, a page in each of the copies submitted by General Star (doc. 27–Ex. I, p. 6) and by Blue Diamond (doc. 30–Ex. B, p. 6) which reflect that the only "covered autos" under the Travelers policy are "SYMBOL 51" vehicles, *Id.*, and not "SYMBOL 47 and 50" vehicles.

The inclusions by General Star, and the omissions by Travelers are puzzling, to say the least, in that the pages are identical (as to dates, and the effective coverage periods), but for the designation of covered autos. Notwithstanding, this court finds that the "inconsistency" has no impact on the outcome of this action as there is no dispute in fact that the trailer involved was a "SYMBOL 51" vehicle, i.e., a "covered auto." Therefore, General Star's Motion To Strike the Exhibit is DENIED.

Nonetheless, this court is concerned about the other "inconsistencies" which General Star refers, e.g., "Page 1 of 13 [doc. 20–Ex. A, p. 21] ... ends with the description of the covered autos enumerated as '50'; however, Page 2 of 13 begins in the middle of a sentence with the word 'borrow'." Due to the referenced inconsistencies, and because the General Star Exhibit (doc. 27, Ex. 1) is supported by an original affidavit of Sue Gardner attesting that Exhibit I "is a true and correct copy" of the subject Travelers' policy, for the purpose of clarity when referencing excerpts from the Travelers policy, this court will cite to the pertinent excerpts set out in document 27–Ex. I.

duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result . . .

.    .    .    .    .

b. This insurance applies to "bodily injury" . . . only if:

(1) The "bodily injury" . . . is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" . . . occurs during the policy period.

2. Exclusions.

This insurance does not apply to:

.    .    .    .    .

g. Aircraft, Auto or Watercraft

"Bodily injury" . . . arising out of the ownership, maintenance, use or entrustment to others of any . . ., "auto" . . . owned or operated by or rented or loaned to any insured. Use includes operation and "loading and unloading".

(doc.27, Ex. J, at p. 10–11). The definitions of "auto" and "mobile equipment" are the same as that noted in the Travelers' policy. *See Id.*, SECTION V—DEFINITIONS, p. 18, items 2 and 11.

According to the General Star policy, "Loading or unloading" means

the handling of property: . . . [a]fter it is moved from the place where it is accepted for movement into or onto an . . . "auto" . . . [w]hile it is in or on an . . . "auto"; or . . . [w]hile it is being moved from an . . . "auto" to the place where it is finally delivered; but "loading or un-

loading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the . . . "auto".

*Id.*, at p. 19–20, item 10.

The General Star policy also includes "Products–Completed Operations" coverage. *Id.*, at p. 3 (General Liability Declarations).

2. LIMITS OF INSURANCE

GENERAL AGGREGATE LIMIT (Other Than Products – Completed Operations $ *2,000,000)*

PRODUCTS–COMPLETED OPERATIONS AGGREGATE LIMIT $ *Included* . . .

*Id.* (underlining in original). The General Star policy defines "Products–Completed Operations hazard" as including

14.a. . . . all "bodily injury" . . . occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

.    .    .    .    .

c. This hazard does not include "bodily injury" . . . arising out of:

(1) The transportation of property, unless the injury . . . arises out of a condition in or on a vehicle created by the "loading or unloading" of it[.]

*Id.*, at p. 20–21.

The Buckmans' claims are based on an occurrence on or about October 23, 1997, at or near Pruitt Production Co., in Silas,

Choctaw County, Alabama.[5] The Buckmans allege that Glenn Buckman was injured when steel pipe being loaded onto a trailer rolled off and struck him due to the improper preparation of the trailer by the driver. The Buckmans claim that the pipe rolled off of the Blue Diamond trailer as a result of the incorrect placement of the pins in the trailer.

Buckman was employed as a floor-hand with Oil Field Services & Supply Company ("OFS") which has its principal place of business in Laurel, Mississippi. OFS services land-based drilling rigs (doc. 27–Ex. D–Glenn Buckman deposition, p. 48–50). Since he began working for OFS, Buckman had been involved in the process of loading pipe onto trailers probably several hundred times. The same procedure was utilized each time for loading pipe onto a trailer.

On October 23, 1997, the OFS work crew was preparing to load pipe from a recently dismantled land-based drilling rig onto a trailer.

Doug Pulliam, an employee of Blue Diamond, was the driver of the Blue Diamond tractor/trailer rig ("8–wheeler") (doc. 87–Ex. G, Doug Pulliam deposition [6], p. 8–9, 80–81), an "over-the-road tractor with a drop-deck trailer." *Id.*, at p. 9. The lowboy/trailer was owned by Blue Diamond (doc. 20–Ex. C–Eugene Creel [7] deposition, p. 7–23). After arriving at the loading site, Pulliam, pulled the truck next to a stack of pipe (doc. 20–Ex. D-deposition of Larry White [8], p. 11–12).

Pulliam prepared the trailer by placing steel pipe pins into brackets or pockets located on the side of the trailer. The pins are two to three foot pieces of rectangular metal tubing (doc. 87–Ex. G, p. 48, 109). Blue Diamond supplied Pulliam with four pipe pins that were used to hold the pipe on the trailer during loading.

Prior to starting the loading process, Pulliam placed the pipe pins into the brackets on the lowboy, "two on each side." *Id.*, at p. 13. Pulliam placed the first three pins into the pockets and used a claw hammer to hit the pins into position on the rear driver's side, two pins on each side of the trailer.

Creel testified that he saw only two pins on the passenger side of the trailer (doc. 20–Ex. C, p. 12–13).[9] White testified that he watched Pulliam "drive" all four pins. *Id.*, at Ex. D, p. 12–13.

Pulliam also placed timbers or boards on the trailer bed for the first layer of pipe. The timbers are used to distribute the weight of the pipe.

Although Buckman did not actually see Pulliam prepare the trailer or place the

---

5. All the factual evidence regarding what occurred in connection with Mr. Buckman's injuries is before the court and is considered.

6. Pulliam's deposition was taken on August 17, 2000; at the time, he was no longer employed by Blue Diamond (doc. 87–Ex. G, p. 1–8). A full transcript and video tape of the deposition has been submitted by General Star (doc. 105, Ex. B). Both have been reviewed by the court.

7. Creel is an employee of OFS. At the time of the accident, he had worked for the company for about five years as a rig manager (doc. 20–Ex. C, p. 5)

8. White was atop the trailer with Buckman at the time of the accident (doc. 20–Ex. D, p. 10).

9. Creel also testified that after the accident he "noticed three of the four pipe [pins] still in place ..."; "the back one [on the driver's side] had come out." *Id.*, Ex. C, p. 22.

pins on the trailer, he did see the pins after they were in place. Buckman and Creel both testified that it is the driver's responsibility to determine whether the pins were placed far enough into the brackets and the workers rely on the truck driver to make sure that the trailer is prepared for loading.

Pulliam testified that it was "[his] responsibility to make sure that the trailer is loaded where it is safe to haul," and that he watched the pipe being loaded (doc. 87–Ex. G, p. 20).

The next step in the loading process was to load the pipe onto the trailer from the forklift (doc. 27–Ex. D, p. 67). The loading process usually involved a four man crew composed of two men on the trailer who assisted in moving the pipe, one man who operated the forklift, and one man who rolled pipe onto the forklift. During the normal loading process, the workers on the trailer would stand on the pipe previously loaded in order to line up the next layer.

On the day Buckman was injured, the forklift was operated by Tim Clark. Steve Lorrett was on the ground pushing pipe onto the forklift. The pipe is described as "7–inch casing" weighing "23 pounds per foot" (doc. 20–Ex. C, p. 7, 13, 19), "probably 40, 42, 43 feet." *Id.* Ex. D, p. 17. After the first layer was loaded, White asked Buckman to assist him with loading the second layer of pipe. Buckman did not assist with loading the first layer of pipe. White was positioned at the front of the trailer near the cab. Buckman was positioned at the rear of the trailer. As he walked to the rear of the trailer, Buckman noticed that the pins were placed at the front and rear of the driver's side of the trailer and appeared to be placed correctly in the pockets. There were no pins on the passenger side of the trailer. The pipe was

being loaded on the passenger side of the trailer (doc. 87–Ex. G, p. 31–32).

Pulliam did not give Buckman or any other member of the work crew instructions on how to load the pipe. Pulliam testified that after the loading got started he went up into the cab of his truck to do paperwork. *Id.,* at p. 21. The work crew received their loading instructions from Creel. OFS had no written instructions or safety guidelines for the proper procedures for loading pipe onto a trailer, nor did it have any safety training relating to loading pipe onto trailers.

After the first layer of pipe was loaded, the next layer was stacked on top of the previous layer. The normal procedure involves the workers standing on the previous layer of pipe and using a crowbar or pry-bar to move the pipe against the pins. Following this routine on the date of the accident, the forklift loaded the pipe onto the trailer and the work crew moved the first layer of approximately ten lengths of pipe across the width of the lowboy and against the pins. For the second layer, the forklift transported about three or four lengths of pipe to the trailer.

To move the second layer of pipe being loaded, Buckman stood on the first layer of pipe near the end of the trailer. Buckman used a pry-bar to move the pipe so that they would be against the pins.

When loaded, the second layer of pipe did not fall into their correct places (into the openings between the lengths of pipe on the first layer—which, if they had laid correctly, they would be forming a pyramid) and Buckman with the use of the pry-bar attempted to move the pipe into their correct places (doc. 20, p. 4, ¶3, *citing* Ex. D, p. 9–10).

Buckman had already moved several lengths of pipe with the pry-bar and was

moving the fourth when the pipe began rolling. When the fourth pipe was moved, the pin located in the rear of the trailer came out. Buckman rolled off the trailer with the pipe and was struck by three falling lengths of pipe. Buckman did not see or hear anything before the pipe began rolling.

According to White, Pulliam had used a claw hammer to drive this pin into its bracket. White testified that after the accident he replaced the dislodged pin into the trailer bracket and pounded it in with an eight-pound sledgehammer to insure that the pin would not become dislodged a second time (doc. 31, p. 19–White depo., p. 26).

Pulliam testified that it was the pin at the rear driver's side of the trailer that had come out (doc. 87–Ex. G, p. 46). After the accident, Pulliam inspected the pin and testified that it was bent at "approximately a forty-five degree angle." *Id.,* at p. 47. Pulliam claimed that he replaced the pin after the accident. *Id.*

White testified that the pin was not bent when he recovered it (doc. 31, p. 19–White depo., p. 26–27).

Creel testified that at the time of the accident the forklift was not near the trailer but was picking up another load of pipe from the stack on the ground (doc. 20, p. 5, ¶1).

Q. ... Do you know where the forklift was short—right before this accident happened?

A. Forklift was on the passenger side about 15 foot from the truck.

Q. Wasn't anywhere close to the trailer?

A. Huh-uh (negative response).

Q. Wasn't involved at all?

A. He was gone to get another load.

Q. So the forklift wasn't in the process of putting pipe down—

A. No.

Q.—or you weren't using the forklift to move the pipe over?

A. No.

Q. Do y'all ever use the forklift to move pipe over once it's on the trailer?

A. We have done that.

Q. Do you see anything wrong with doing that?

A. Not when you can do that I don't.

Q. I'm talking about using the forklift to bump the pieces of pipe over.

A. No, I don't see nothing wrong with it.

Q. But it is your testimony that wasn't going on at that time?

A. No, it wasn't.

(doc. 27–Ex. F, p. 23–24). Buckman testified that the forklift was "nowhere near" the trailer when the pipe fell from the trailer (doc. 27–Ex. D, p. 113).

Lawrence DeLong, the manager of Blue Diamond, testified that he was told by Pulliam that at the time of the accident the OFS work crew was using the forklift to bump into the trailer in an effort to knock the upper layer of pipe into place (doc. 20, p. 5, ¶1).

A. He told me he was sitting up in the cab of his truck, I think he was doing his logs, and they were trying to straighten some pipe up and he said he felt a bump in his truck, a bump in the truck, and he looked and—... he [Buckman] was on top of the pipe, which he said he thought was awful dangerous because they nev-

er—you never get on top of the pipe when you're loading it like that. And they were trying to squeeze a couple of more joints on and they were hitting it with a forklift and he said it felt like it just bumped it too hard and the pipe rolled over and kicked out one of the pipe [pins] ...

(doc. 20–Ex. F–Lawrence DeLong deposition, p. 31–32).

Pulliam's deposition reflects the following exchange between Pulliam and counsel for General Star:

A. Well, at the times that I know they was using the forklift, once the pipe was—was on the trailer, they'd take the forks and tilt them down a little bit and put them up against the pipe and then they'd shove it over.

Q. All right.

A. So they'd put the forks up against the pipe and—and shove it over.

Q. And kind of bump it over each—

A. Yeah.

Q.—each piece of pipe on the bottom?

A. Yeah. I know they had—they had used the forklift.

Q. Now, when they did that, did you notice any effect that that had on the trailer?

A. No, it—everything—everything looked good.

Q. Did it cause the trailer to move or rock?

A. Oh, yeah, yeah. Yeah, because it took quite, you know, quite a bit of effort even for the forklift because the pipe would be down in a crevice but it wouldn't be in the crevice that it

needed to be in. So it takes, you know, it takes trying to push it from the middle of the pipe, it takes a good bit of force to get it over—over the hump.

(doc. 87–Ex. G, p. 32–33). Pulliam also testified: "*At the time of the accident, honestly I cannot say whether they was using the forklift to push the pipe.* All I know— all I remember is doing—doing my paperwork, hearing the pipe and I knew it had come off the trailer. And I looked in my rearview mirror and sure enough the pipe was on that boy." *Id.,* at p. 36–37 (emphasis added).

Pulliam stated that in the aftermath of the accident, the same procedures were used to complete the loading process including the bumping procedure with the forklift (doc. 87–Ex. G, p. 51–52).

### B. Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). A party is entitled to a judgment as a matter of law unless the nonmovant demonstrates that a genuine dispute exists as to an element of his case on which he has the burden of proof. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Everett,* 833 F.2d at 1510. Pursuant to Local Rule 7.2, a failure by the opposing party to point out disputed facts will be taken as an admission that no material factual dispute exists. All factual matters are to be viewed

in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Summary judgment is improper if "the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). With the summary judgment standard in mind, this order addresses the motions for summary judgment filed by the parties herein.

### C. Discussion

*1. Choice of Law.*

Travelers and General Star both argue their positions under Alabama substantive law. (Although Blue Diamond is no longer in this case, the court finds that its Brief and discussion of Oklahoma law, *see* doc. 30, p. 12–18, is helpful).

▮▮▮ As an initial matter this court must determine the substantive law to be applied to the controversy. In diversity cases, the choice-of-law rules of the forum state determine which state's substantive law applies. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see American Family Life Assurance Co. Of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir.1989). Alabama law holds that the law of the state where the insurance policy was delivered to the insured con-

trols the interpretation of the insurance contract. *Ferris v. Jennings*, 851 F.Supp. 418, 421–22 (M.D.Ala.1993); *Ailey v. Nationwide Mutual Ins. Co.*, 570 So.2d 598 (Ala.1990). Herein, there is no dispute that the Travelers and the General Star policies were delivered to Blue Diamond in Oklahoma. Thus, this court finds that Oklahoma substantive law applies. Neither Travelers, nor General Star have objected (*see* docs. 104, 108).

### *Oklahoma Substantive Law.*

▮▮▮ An insurance policy constitutes a contract. *First Bank of Turley v. Fidelity & Deposit Ins. Co. of Maryland*, 928 P.2d 298, 304, n. 6 (Okla.1996) (certified questions to the Supreme Court of Oklahoma *in re* an insurer's duty to defend and the notice requirement) (*citing Silver v. Slusher*, 770 P.2d 878, 883 (Okla.1988) (interpretation of insurance contract under Oklahoma's uninsured motorists statute), *cert. denied*, 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989)). "The relationship between the insured and the insurer clearly is contractual in nature." *Silver*, at 883.

A liability insurance policy generally contains two basic duties—the duty to defend and the duty to indemnify its insured … The insurer's primary duty is to provide indemnity for loss or to pay a specified amount upon determinable contingencies … The duty to defend is separate from, and broader than, the duty to indemnify, … but the insurer's obligation is not unlimited. The defense duty is measured by the nature and kinds of risks covered by the policy as well as by the reasonable expectations of the insured … An insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the potential of liability under the

policy ... The insurer's defense duty is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer ... at the time the defense is demanded ... rather than by the outcome of the third-party action ...

... An insurer who disputes the insured's demand to defend has three options. It can (1) seek declaratory relief that would define the insurer's rights and obligations; (2) defend the insured under a reservation of rights, or (3) refuse to take any action at the peril of being later found in breach of its duty to defend ...

*First Bank of Turley*, 928 P.2d at 302–305 (footnotes omitted).

Herein, Travelers has opted to defend under a reservation of rights and seek declaratory relief. General Star has chosen option number three (3).

In Oklahoma, insurance contracts are considered contracts of adhesion.[10] If susceptible of two constructions, the contract will be interpreted most favorably to the insured and against the insurance carrier. *Littlefield v. State Farm Fire & Casualty*, 857 P.2d 65, 69 (1993) (contract interpretation of loss of consortium claim arising out of an auto-accident-wrongful-death).

[A]ny doubt concerning the terms of an insurance contract must be resolved in favor of the insured ... And beyond this

the law requires that the policy be liberally construed consistent with the policy's general declaration of coverage and the object it is designed to accomplish and, if possible, to give effect to all of its provisions.

*Bolding*, 841 P.2d at 630 (contract interpretation of insurer's group health policy) (citations omitted).

However, the Oklahoma Supreme Court has "admonished courts not to indulge in forced or strained constructions to create and then construe ambiguities where they do not otherwise exist." *Roberts*, 23 F.Supp.2d at 1303; *Max True Plastering*, 912 P.2d at 869. Insurance contracts "should ... be interpreted by courts in their plain and ordinary sense if the policies are clear and unambiguous." *Roberts*, at 1301; *Littlefield*, 857 P.2d at 69; *Penley v. Gulf Ins. Co.*, 414 P.2d 305, 308 (Okla.1966), *distinguished on other grounds*, *Industrial Underwriters Ins. Co. v. P & A Construction Co.*, 382 F.2d 313 (10th Cir.1967). "If the terms of insurance policies are unambiguous, clear, and consistent, courts should enforce the policies as written to carry out the expressed intention of the parties." *Roberts*, 23 F.Supp.2d at 1301.

Oklahoma also adopted, within the context of "loading and unloading" clauses which are at issue herein, the " 'complete operation' rule." *P & A Construction*, 382 F.2d at 316 (*citing Penley v. Gulf Ins. Co.*, 414 P.2d 305 (Okla.1966)). The "complete operation" doctrine "holds

---

**10.** An "adhesion contract" is defined as a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usu. A consumer, who has little choice about the terms." *Black's Law Dictionary*, 318–19 (7th ed. 1999). See, *Roberts v. Farmers Ins. Co., Inc.*, 23 F.Supp.2d 1298,

1303, n. 2 (N.D.Okla.1998), *aff'd*, 201 F.3d 448 (10th Cir.1999) (Table); *Max True Plastering v. U.S. Fidelity & Guaranty Co.*, 912 P.2d 861, 863 (Okla.1996); *see also Bolding v. Prudential Ins. Co. of America*, 841 P.2d 628, 630, n. 4 (1992) (*citing Black's Law Dictionary*, 38 (5th ed. 1979)).

that the 'loading and unloading' includes the entire process involved in the movement of the articles from the place where insured's employees find the articles, which are to be moved by truck to the place where the employees of insured turn them over to the party to whom they are to make delivery." *P & A Construction,* at 315 (*quoting Penley,* 414 P.2d at 310). The phrase "including loading and unloading" is a phrase of extension, that it expands the expression "use" of the truck beyond its connotation otherwise. *Id.*

■■■ In connection with the "complete operation" doctrine, Oklahoma also relies on the "causal relation" doctrine. In *P & A Construction,* the Court explained: "In order for coverage to exist under the loading or unloading clause of a policy of liability insurance, it must not only appear that the accident which resulted in an injury occurred during the loading or unloading period but that the accident was casually connected with the loading or unloading." *Id.,* at 316.

In *Penley,* the insurance policy covered liability "arising out of the ownership, maintenance, or use" of the vehicle with coverage enlarged by a loading and unloading clause. The Oklahoma Court said that the policy would not provide coverage if the injury was directly caused by some independent act or intervening cause wholly disassociated from, independent of and remote from the use of the vehicle. *Penley,* 414 P.2d at 310–11; *accord P & A Construction,* at 317.

Utilizing the Oklahoma substantive standard, this court analyzes the issues raised.

*The Motions For Summary Judgment.*

There is no dispute that the subject policies were in effect at the time of the accident, and that the accident constituted an "occurrence" in the "covered territory." Nor, is there any dispute that the Blue Diamond trailer used was a "covered auto" under the subject policies.

*(a). The Travelers Policy.*

■■■ The Travelers Policy provides coverage unless Exclusion 8 precludes coverage. Travelers argues that Exclusion 8, precludes coverage for Blue Diamond with regard to the Buckmans' claims. Under Exclusion 8, within the context of this case, there is no coverage for injury resulting from the movement of property, i.e., the pipe, by a mechanical device unless the device is a "hand truck" or the device was attached to the trailer at the time of the accident. The Travelers policy is written to allow coverage in two extremes, when materials, can be, and are being, moved with a hand truck or when materials can only be, and are being moved with the use of an apparatus attached to the vehicle.

The facts presented establish that the pipe was of sufficient size and weight that a forklift was necessary to load it on to the trailer. A hand truck was not used to load the pipe, nor was any mechanical loading device attached to the trailer at the time of the accident.

The facts establish that just prior to the accident the "property," i.e., the pipe was being "moved," i.e., loaded, by a freestanding forklift, independent of the trailer and by Buckman's use of a pry-bar. There is no dispute that a forklift and a pry-bar are mechanical devices. Thus, first impression indicates that Exclusion 8 is triggered and coverage is precluded.

The evidence presented indicates that the pin located at the rear of the trailer bed on the driver's side came out due to its

alleged negligent placement, which allowed the pipe to move off the trailer. There is sworn testimony that the forklift was approximately fifteen feet away from the trailer when the accident occurred and thus, there was no "movement of property" by a "mechanical device" at the moment the accident occurred.

Travelers argues that the factual dispute as to how the forklift was used is of no consequence with regard to Exclusion 8; "the inquiry as to whether the exclusion applies ends once it is determined whether a mechanical device was used in the loading process" (doc. 36–Travelers' Response to Blue Diamond's Motion For Summary Judgment, p. 3, ¶3 (emphasis in original), *relying on Cobb County v. Hunt*, 166 Ga. App. 409, 304 S.E.2d 403, 404 (1983)).[11]

This court agrees, and under Oklahoma's broad "complete operation rule," *P & A Construction*, 382 F.2d at 315, together with the "causal relation doctrine," *P & A Construction*, at 316, the "entire process involved in the movement of the [pipe]" by the use of the forklift, whether used to simply move the pipe or to "bump" the pipe already placed on the trailer, must be included under the term "loading and unloading." *Id.* Further, the evidence indicates that Buckman's fall and resulting injuries arose out of the "loading" of the trailer and was directly caused, not "by some independent or intervening cause wholly disassociated from, independent of and remote from the use of the [trailer]," *Penley*, 414 P.2d at 310–11, but by the alleged negligent placement of a pin routinely placed in the trailer to effect the "loading" of the trailer. *Accord P & A Construction*, at 317. Under the Oklahoma standard, the use of the forklift triggers Exclusion 8.

■ General Star counters that "there is no admissible evidence that the pipe [was] being moved by a 'mechanical device' at the time of the accident." (Findings of Fact and Conclusions of Law Proposed by the Defendant General Star, p. 15, ¶u). The court holds that a forklift or a pry-bar is a mechanical device.

■ This court finds that the language of Exclusion 8 is clear and unambiguous. Coverage extends to injuries sustained during the movement of property, but only where the movement is being accomplished by means of a hand truck or a mechanical device attached to the trailer. Herein, a forklift, an undisputed mechanical device, was being used in the loading process to move property from the stack of pipe on the ground, if not to "bump" the trailer to force the second layer of pipe to settle in its proper place on the trailer bed. Thus, Exclusion 8 is triggered and insurance coverage under the Travelers policy is unavailable. Therefore, the Summary Judgment Motion filed by Travelers is due to be granted.

### (b). The General Star Policy.

■ The General Star policy provides coverage for bodily injury, but coverage is precluded by Exclusion 2.(g), injuries arising out of the "use" of a covered vehicle and "use" includes "loading and unloading," i.e., "the handling of property" (doc.

---

11. Travelers also relies on *Dauthier v. Pointe Coupee Wood Treating, Inc.*, 560 So.2d 556, 558 (La.Ct.App.1990), and *Excel Logistics, Inc. v. Maryland Casualty Co.*, 1995 WL 66990, CV 93–0046415 S (Conn.Super. 1995) (granting summary judgment for the insurer on the issue of coverage when worker was injured by jumping off a load of steel being moved by an unattached forklift). These cases are not binding on this court.

27–Ex. J, p. 10–11, 19–20). The definition of "loading and unloading," in the General Star policy provides that " 'loading and unloading' does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the ... 'auto'[,]" *Id.,* at 19–20, language similar to Exclusion 8 in the Travelers policy.

It has been contended that the General Star policy also includes "products-complete operations hazard" coverage which includes " 'injury' arising out of a condition in or on a vehicle created by the 'loading or unloading' of [a Blue Diamond "covered auto"]" (doc. 30, p. 16, ¶3). General Star does not dispute this.

It has been argued that "[s]ince Mr. Buckman's injuries resulted from the alleged improper or negligent placement of metal pins in the ... trailer ... during ... loading ..., the General Star products-completed operations coverage affords coverage to Blue Diamond with respect to the Buckmans' claims ..." *Id.*

It has been claimed that there is a conflict between Exclusion 2.(g), which General Star maintains is applicable herein, and the products-completed operations coverage afforded to Blue Diamond resulting in ambiguity, and under Oklahoma law (*citing Bolding,* 841 P.2d at 630), that ambiguity must be resolved against General Star (*see* doc. 30, p. 17, ¶2).

After careful review of the General Star policy this court finds ambiguity. The language of the General Star policy *in re* coverage is not clear and "[a]ny doubt concerning the terms ... must be resolved in favor of the insured ..." *Bolding,* 841 P.2d at 630. The policy excludes under 2(g) injury arising out of the use of any Blue Diamond vehicle; "[u]se includes operation and 'loading and unloading'," (doc. 27, Ex. J, at p. 10–11), as noted, as does the Travelers policy which this court has found a clear exclusion precluding coverage.

However, the General Star policy, unlike the Travelers policy, includes, as noted "products-completed operations" coverage, *Id.,* at p. 3, which includes, according to Item 14.c., injury "arising out of a condition in or on a vehicle created by the 'loading or unloading of it.' " *Id.,* at p. 20–21. This language clearly provides coverage for the activity and events giving rise to Buckman's injuries. The Blue Diamond vehicle was being loaded and a condition on the Blue Diamond trailer, i.e., the pin—whether negligently placed or whether jostled loose by the "bumping" of the forklift, caused the already loaded pipe to shift and roll from the trailer bed carrying Buckman with it.

Thus, under the language of the General Star policy, the "products-complete-operations-hazard" provision provides coverage for the loading of material on the Blue Diamond trailer (Item 14.c.), while Exclusion 2(g), precludes coverage for the same activity. This court finds that these provisions create ambiguity as to available coverage. Under the Oklahoma standard, this ambiguity must be resolved against General Star and in favor of coverage for Blue Diamond including General Star's duty to defend, and to provide liability for damages.

Further, as noted, General Star refused to defend and indemnify Blue Diamond *in re* the Buckmans' claims, at the peril of being later found in breach of its duty to defend ... *First Bank of Turley,* 928 P.2d at 305. This court's finding that coverage is due Blue Diamond by General Star, puts General Star in the position of having breached its duty to defend and indemnify Blue Diamond. *First Bank of Turley,* 928

P.2d at 305 ("[i]f a duty to defend was the insured's due under the insurance contract, an insurer's refusal to defend was in breach of that obligation ..."). Such a breach "renders the insurer liable for all reasonable expenses incurred by an insured in defense of a third-party action." *Id.* As such, the Summary Judgment Motion filed by General Star is due to be denied.

### D. Conclusion

For the reasons set forth, it is ORDERED that the Summary Judgment Motion filed by Travelers is hereby GRANTED. The Summary Judgment Motion filed by General Star is hereby DENIED.

General Star owes reimbursement to Travelers for the costs of the defense rendered to Blue Diamond by Travelers, as well as indemnification to Travelers for the portion of the liability Travelers paid to the Buckmans on behalf of Blue Diamond (*see* footnote number 1).

Travelers is ORDERED to submit, on or before Monday, July 16, 2001, a claim together with documentation for their attorney's fees and costs of defending this cause in the State Court.